IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| BRITTNEY HALLMAN, *on behalf of herself and all other similarly situated*, | ) ) ) ) |
| *Plaintiff,* | ) Case No.: 8:24cv222 ) ) ) |
| v. | ) ) |
| FLAGSHIP RESTAURANT GROUP, LLC, | ) CLASS ACTION ) COLLECTIVE ACTION ) ) |
| *Defendant,* | ) ) |

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR
CONDITIONAL COLLECTIVE ACTION CERTIFICATION AND
PROVISION OF NOTICE TO PROSPECTIVE CLASS MEMBERS**

Plaintiff Brittney Hallman, on behalf of herself and all others similarly situated, brings this action in part to collect unpaid wages owed to her under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b). *See* Second Amended Complaint [Doc. #63], Count I, ¶¶ 43-71. Plaintiff now seeks to conditionally certify Count I as a collective action pursuant to the FLSA, 29 U.S.C. § 216(b), and to have notice of this action issued to all prospective class members. In support of her Motion, Plaintiff states as follows:

**I.    INTRODUCTION**

Plaintiff is a former employee of Defendant Flagship Restaurant Group, LLC ("Flagship," or "Defendant"). In Count I of her Second Amended Compalint, Plaintiff alleges that Flagship violated the FLSA in several ways, including by:

- Requiring tipped employees to spend more than 20% of their shift performing non-tipped maintenance and preparatory work "side work" without full minimum wage compensation,

in violation of the "80/20 Rule," 29 U.S.C. § 203 and the Dual Jobs Regulation at 29 C.F.R. § 531.56(e), as outlined in *Fast v. Applebee's Int'l, Inc.*, 638 F.3d 872 (8th Cir. 2011);

- Operating an unlawful tip pool that required tipped employees to share tips with customarily non-tipped employees, in violation of 29 U.S.C. § 203(m)(2)(A) and its associated regulations;

- Taking the FLSA tip credit without providing proper notice, in violation of the FLSA and 29 C.F.R. § 531.59(b); and

- Failing to properly pay overtime wages when tipped employees worked more than 40 hours/week, in violation of 29 U.S.C. § 207(a)(2).

Because FLSA collective actions, unlike Rule 23 class actions, require individual employees to affirmatively opt in to a case to preserve their rights, early conditional certification of a class is common in order to facilitate notice to prospective class members, and inform them of their rights to participate and their protections in the event they do decide to join the case. While discovery in this matter is in its early stages, information obtained to date supports Plaintiff's claims that the allegedly unlawful wage payment practices she was subjected to applied at all of Defendant's restaurants around the country. To vindicate their rights under the FLSA and recover damages for Defendant's actions, Plaintiff now seeks to conditionally certify a collective action of "[a]ll persons employed as servers/bartenders by Flagship Restaurant Group" from June 14, 2021 to the present. (Second Am. Compl. [Doc. #63] ¶ 31). Plaintiff further seeks approval for mailing and electronic publication of notice to all putative class members as set forth below.

II.     **PROCEDURAL POSTURE**

Plaintiff Hallman filed her initial Complaint on June 14, 2024, [Doc. #1], on behalf of herself and all other similarly situated employees of Defendant Flagship Restaurant Group.

2

Plaintiff alleged that Defendant has, among other things, violated the FLSA by improperly paying tipped employees in the manner set forth above. On July 29, 2024, Plaintiff filed her Amended Complaint [Doc. #35], bringing largely the same claims set forth in her initial Complaint the month prior. Across two motions filed on August 12, 2024 and September 30, 2024, Defendant moved to dismiss all of Plaintiff's claims. [Docs. ## 42, 54]. After the matter was fully briefed, the Court denied Defendant's Motions to Dismiss on January 15, 2025, and granted Plaintiff leave to file a Second Amended Complaint [Doc. #62]. Plaintiff filed that Second Amended Complaint [Doc. #63] on January 21, 2025. Judge DeLuca entered a Final Progression Order [Doc. #69] on March 6, 2024, which set a deadline to file this Motion for Conditional Collective Action Certification on June 2, 2025, and allows for a period of discovery running through March 24, 2026. Since that time, the Parties have exchanged initial Rule 26(a)(1) disclosures and are in the early stages of written discovery, with only limited document exchange occurring to date. Moreover, over thirty current and former employees have opted in to participate in the prospective class/collective action. Plaintiff now moves for conditional certification of the FLSA collective action alleged in Count I of her Second Amended Complaint.

### III.  ARGUMENT

#### A.  Standard of Review

The FLSA allows named plaintiffs to bring suit "for an on behalf of . . . themselves and other employees similarly situated." 29 U.S.C. § 216(b); *Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 796 (8th Cir. 2014). "A district court may certify a case as a collective action only if members of the class are similarly situated or raise similar legal issues regarding coverage, exemption, or nonpayment of wages." *Haworth v. New Prime, Inc.*, 448 F. Supp. 3d 1060, 1066 (W.D. Mo. 2020) (citation and internal quotation marks removed). "Although the Eighth Circuit

3

has not articulated a standard for conditionally certifying FLSA classes, the majority of district courts in the Eighth Circuit use a two-step process." *Id.* "At the first stage, a class is conditionally certified on a relatively minimal showing. " *Fuelberth v. Godfather's Pizza, Inc.*, 8:22cv195, 2023 WL3024617, at *1 (D. Neb. Apr. 20, 2023) (citation removed). Courts do not make findings of fact or credibility determinations at the conditional certification stage; rather, the decision "is only based on the pleadings and affidavits in the record." *Id.* So long as the Plaintiffs "establish[] a colorable basis that the putative class members are the victims of a single decision, policy, or plan," conditional certification should be granted. *Id.* (quoting *Cortez v. Nebraska Beef, Inc.*, Case Nos. 8:08cv90, 8:08cv99, 2008 WL 5076254, at *4 (D. Neb. Nov. 21, 2008) (Report & Recommendation adopted in full by the District Court). "In assessing the adequacy of a plaintiff's showing [for conditional certification], district courts look to pleadings, affidavits, and declarations, but often authorize notice based solely on the personal observation of one plaintiff's affidavit." *Fuelberth*, 2023 WL 3024617, at *2 (quoting *Juarez v. 449 Restaurant, Inc.*, 29 F. Supp. 3d 363, 369 (S.D.N.Y. 2014). At the notice stage, "any doubts . . . should be resolved in favor of allowing conditional certification. *Mahoney v. CommonSpirit Health*, 8:21cv23, 2021 WL 5907929, at *3 (D. Neb. Dec. 14, 2021) (citing *Haworth*, 448 F. Supp. 3d at 1066). Then at the second stage, typically after discovery is largely complete, Plaintiffs must make a stronger showing or risk having their class decertified. *Id.*

The goal of judicial economy weighs heavily in favor of certification and issuing notice to potential class members. *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989) (discussing opt-in collective actions under the Age Discrimination in Employment Act). Collective actions benefit the judicial system by enabling "efficient resolution in one proceeding of common issues of law and fact." *Id.* Furthermore, the format provides plaintiffs "the advantage of lower individual

costs to vindicate rights by the pooling of resources." *Id.* "These benefits, however, depend on employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate." *Id.* Therefore, courts routinely grant conditional certification and supervised notice under 29 U.S.C. § 216(b). *E.g.*, *Dernovish v. AT&T Operations, Inc.*, 09cv0015, 2010 WL 143692 (W.D. Mo. Jan. 12, 2010) (finding that plaintiffs had "exceeded" the standard for conditional certification of a nationwide class based upon declarations and opt-ins of employees from three facilities); *Kautsch v. Premier Communications*, 504 F. Supp. 2d 685, 688-90 (W.D. Mo. 2007) (conditionally certifying a class of field service technicians); and *Fast v. Applebees Int'l, Inc.*, 243 F.R.D. 360 (W.D. Mo. 2007) (conditionally certifying a nationwide class of bartenders and servers under the "lenient notice standard").

### B.  Plaintiff Satisfies the "Lenient" Step One Burden

As set forth above, Plaintiff alleges that Defendant has violated the FLSA in several ways with respect to both her and the broader prospective class, including violation of the 80/20 Rule, operating an unlawful mandatory tip pool, taking the tip credit without providing proper notice, and failing to pay overtime properly when employees worked in excess of 40 hours/week. *See infra*, Section I. The result of Defendant's unlawful actions has been to consistently compensate servers at sub-minimum wages. At this preliminary stage of the case, Plaintiff's contentions are supported by the allegations in her Complaint and Declarations from five current and former employees at Flagship restaurants across the country. **See Exhibits A-E** (Declarations of Brittney Hallman, Cara Cumberford, Catherine Howard, Claire Hutson, & Brennen Zerbe).

5

### i. Defendant had a policy and practice of violating the 80/20 Rule and the Dual Jobs Regulation

Particularly given the lenient standard of review at this early stage of the case, Plaintiff has presented a colorable basis to find that Defendant had a uniform policy and practice of paying sub-minimum wage for non-tipped work in violation of the 80/20 Rule and the Dual Jobs Regulation. The named Plaintiff, Brittney Hallman, worked at Defendant's Blue Sushi Sake Grill location in Kansas City, Missouri since before the restaurant opened in November 2022 until June 2024. Throughout that time, Hallman earned either $6.25 or $6.50 per hour, below the standard federal minimum wage. Hallman earned tips for part of her work, but she also performed a significant amount of non-tipped "side work," such as folding napkins, setting tables, stocking soy sauces, filling ice, and cutting cucumbers, among other things. While she had some side work mixed in even when serving tables, Hallman also had lengthy periods where she was solely performing side work at the beginning and end of her shift. On opening shifts, she would arrive about an hour before the store opened to do prep work. After being cut on a day shift, she would have to do approximately 30 minutes of side work, with virtually no serving work intermixed, before being able to go home. On night shifts, Hallman would arrive about 30 minutes before getting any tables to get a head start on her side work. After getting cut or after closing on a night shift, she would have anywhere from 30 minutes to 2 hours of side work, during which time she again had no tables, before being able to go home. On double shifts, she would have the typical beginning and end of shift side work described above, plus an additional 30 minutes to an hour between the lunch and dinner rush where she was primarily performing side work. Throughout those shifts, Hallman was paid below the standard minimum wage, whether she was focused on tables or doing primarily (or even exclusively) side work for lengthy stretches. **See Ex. A**, Hallman Decl. ¶¶ 2-16.

The other declarants have similar stories, strongly indicating that Defendant's conduct regarding the 80/20 Rule is uniform and nationwide at all of its restaurants. Opt-in Plaintiff Cara Cumberford has worked at Defendant's restaurants in Westwood, Kansas and Austin, Texas as a server and/or bartender. At each restaurant, she spent a significant portion of her time performing non-tipped side work. This included frequent stretches of 1.5 – 2 hours at the start of an opening shift, an hour after getting cut from an evening shift, and/or 1 – 1.5 hours at the end of a closing shift, where she would have no tables and just be doing side work. She would also have to perform a significant amount of side work even while also working tables, approximating 30-40% of her work during that time. Regardless of the work she was doing, Cumberford earned a sub-minimum wage her entire time at Blue Sushi. **See Ex. B**, Cumberford Decl. at ¶¶ 2-22. Since moving to Anthem (another Flaghship restaurant brand) in the summer of 2024, Cumberford has seen very similar policies and practices regarding pay and side work to what she saw at Blue Sushi, with the exception that bartenders (but not servers) clock in at a higher wage rate for pre-opening setup work, then clock back in at the lower rate once the restaurant opens. *Id.* at ¶¶ 29-33. Notably, Cumberford worked in Kansas until June 25, 2024, so she did not start at Anthem until after this case was filed on June 14. Discovery will show whether Anthem's policy regarding pre-shift work for bartenders has always been different, or if it was changed in response to this case.

The Declarations of Opt-in Plaintiff Catherine Howard, a former server at Blue Sushi in Des Moines, Iowa, Claire Huston, a former server and bartender in Dallas and Austin, Texas, and Brennen Zerbe, a server who has worked at the Westwood, Kansas and Kansas City, Missouri locations, tell a similar story: employees who were paid sub-minimum wage (for their entire time as servers and/or bartenders in the cases of Howard and Hutson, and for at least part of the class period in the case of Zerbe), regardless of actual work performed and despite performing

significant amounts of side work during their shift. *See* **Ex. C,** Howard Decl. ¶¶ 2-9; **Ex. D**, Hutson Decl. ¶¶ 2-16; **Ex. E**, Zerbe Decl. ¶¶ 2-19.

### ii. Defendant has a policy and practice of operating an unlawful tip pool

Similar to the evidence set forth above regarding violations of the 80/20 Rule and the dual jobs regulation, Plaintiff has also put forth a colorable basis to find that Flagship operated an unlawful tip pool in violation of 29 U.S.C. § 203(m)(2)(A) and its associated regulations. The Second Amended Complaint details the allegedly unlawful tip pooling scheme, in which servers and bartenders were required to share tips with sushi chefs and support staff, who were not ordinarily tipped employees. (Second Am. Compl. [Doc. #63] ¶¶ 5-18). Details of Defendant's tip pooling policy are set out in further detail in the attached Declarations. Plaintiff Hallman, for instance, recalls being required to tip out 4% of total sushi sales to the sushi chefs, 5% of drink sales to the bar, and 1% of total sales to support staff such as bussers and food runners. During her employment, Hallman was particularly concerned about the portion of the tip-out that went to sushi chefs, especially when she learned that at part of that tip was going to salaried employees. When Hallman asked her managers about the tip-out though, they never got her clear answers, and nothing changed. **Ex. A**, Hallman Decl. ¶¶ 17-22. Opt-in Plaintiff Howard had a similar experience with the tip-out at her Des Moines location. She had to tip out sushi chefs, bartenders, and hosts. Howard recalls that for the sushi chefs, the tip-out initially went to the Executive Chef, who then decided how to divide the tip among the sushi chefs. Howard recalls frequently having to tip out between $70 and $90 per shift to other employees. When she asked her managers about this policy, Howard was told that's just the way it is. **Ex. C**, Howard Decl. ¶¶ 10-13. Opt-in Plaintiff Hutson recalls the exact tip-out percentage varying but remembers that, particularly on weekend nights, she would often have to pay over $100 of her tips to sushi chefs, server assistants, and bartenders.

**Ex. D**, Hutson Decl. ¶¶ 17-20. Cumberford and Zerbe have testified to similar tip-out policies at their locations, generally describing mandatory tip-pooling policies that included employees such as sushi chefs and server assistants who did not customarily receive tips. **Ex. B**, Cumberford Decl. ¶¶ 23-26; **Ex. E**, Zerbe Decl. ¶¶ 20-24.

In all, the allegations in the Second Amended Complaint and the declarations of five employees who have worked at various Flagship restaurants across the country demonstrate more than the "colorable basis" for Plaintiff's allegations necessary to support conditional certification and court-supervised notice at this stage of the case. *See Fuelberth*, 2023 WL 3024617, at *1 (D. Neb. Apr. 20, 2023) (citation removed). Discovery will shed further light on the scope of Defendant's alleged violations,[1] how the Plaintiffs have been damaged and whether class-wide treatment is appropriate moving forward towards a trial. At this preliminary stage, however, the Plaintiff's Motion should be granted because Plaintiff has met the lenient standard for conditional certification and the issuance of court-supervised notice to prospective class members.

    **C. The class should encompass individuals employed up to three years before the date of filing this lawsuit.**

Plaintiffs have alleged that Defendants' conduct was willful under the FLSA. [Doc. 1]. Because willfulness is in dispute, conditional certification should extend to individuals affected by Defendants' policies over a period of three years. *See Rhodes v. Truman Med. Ctr., Inc.*, 4:13cv990, 2014 WL 4722285, at *4 (W.D. Mo. Sept. 23, 2014) (citing *Roebuck v. Hudson Valley*

---

[1] As noted in the Court's Order denying Defendant's Motions to Dismiss [Doc. #62, at 2-3], Plaintiff's allege in Count I that Defendant violated the FLSA in four ways. While Plaintiff's evidence on conditional certification focuses on only two of those alleged violations—violation of the 80/20 Rule/Dual Jobs Regulation, and operation of an unlawful tip pool—Plaintiff asks that only one collective be certified for the entire claim. In later motion practice after discovery, it will be Plaintiff's burden to prove out each alleged violation. Here though, Plaintiff simply requests that one collective be conditionally certified on her FLSA claims, covering all alleged violations.

*Farms, Inc.*, 239 F. Supp. 2d 234 (N.D.N.Y. 2002) for the proposition that when willfulness is contested, a three-year period is appropriate for conditional certification). Courts have recognized that judicial economy is best served by initially certifying a broader class, ensuring that all potential claims are preserved. *See Littlefield v. Dealer Warranty Servs., LLC*, 679 F. Supp. 2d 1014, 1019 (E.D. Mo. 2010). Therefore, notice should be issued to all potentially affected employees, covering a period of three years before the commencement of this action through the present.

### D. The Court should approve the proposed Notice of Claims and Right to Opt In.

In addition to conditionally certifying the prospective class, Plaintiff requests the Court approve notice in the form attached as **Exhibit F** to be sent to a putative class defined as:

> All people employed as servers/bartenders by Flagship Restaurant Group since June 14, 2021.

(*See* Second Am. Compl. at ¶ 31).

The Court has discretion in authorizing judicial notice of a collective action and facilitating notice to potential class members. *Hoffmann-La Roche Inc.*, 493 U.S. at 170. Collective actions benefit the judicial system by enabling the "efficient resolution in one proceeding of common issues of law and fact." *Id.* "These benefits, however, depend on employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate." *Id.* The proposed Notice provides clear and fair notice to putative class members regarding the claims at issue and their rights. It is not prejudicial to Defendants, as it merely informs employees of the existence of the case and makes them aware of their rights to participate (or not). Furthermore, Defendant already possesses the names, last known addresses, email addresses, and telephone numbers of each individual server and bartender employed during the relevant period. Accordingly, Plaintiff requests that the Court order Defendant to conspicuously post the notice in break rooms or next to time clocks at its facilities in

places where employees gather, until the opt-in period closes, and authorize Plaintiff to disseminate the notice to affected employees at their last known mailing address and via text message. *See Dernovish v. AT&T Operations, Inc.*, 09cv0015, 2010 WL 143692, at *2 (W.D. Mo. Jan. 12, 2010) (directing the defendant to post a copy of the Notice in the break room at all its facilities); *Grove v. Meltech, Inc.*, No. 8:20cv193, 2020 WL 7133568, at *6 (D. Neb. Dec. 3, 2020) (approving text message notice in light of the transient nature of employees in the class). ***See* Ex. G**, Proposed Text Message Notice with Link to Full Notice.

In aid of issuing notice, Plaintiffs further request that the Court order Defendant to produce, within 10 days of the Court's Order, in readily readable electronic format, the names, last known addresses, dates of employment, job title, phone number, and email addresses of each prospective member of the class. Courts routinely require defendants to promptly provide a comprehensive class list—including names, last known addresses, telephone numbers, email addresses, and other identifying information—so that notice may be efficiently disseminated. This information is essential to ensuring that all potential opt-in plaintiffs receive timely and accurate notice of their rights. *See, e.g., Greenwald v. Phillips Home Furnishings, Inc.*, No. 4:08cv1128, 2009 WL 259744, at *7 (E.D. Mo. Feb. 3, 2009) (ordering production of names, addresses, and telephone numbers); *Davis v. Novastar Mortg., Inc.*, 408 F. Supp. 2d 811, 818-19 (W.D. Mo. 2005) (requiring provision of names, last known addresses, and telephone numbers within 9 days of the order); *Uwaeke v. Swope Cmty. Enterprises, Inc.*, No. 12cv1415, 2013 WL 3467062, at *4 (W.D. Mo. July 10, 2013) (ordering production of addresses, telephone numbers, and email addresses). Given that such data is typically stored in Defendants' electronic records, Plaintiffs request that it be provided in a readily accessible format, such as in Microsoft Excel files.

Additionally, Plaintiffs request the Court order a 90-day period after the mailing of the Court-authorized notice for those persons receiving notice to submit their consent forms to join the case. *See* **Exhibit H**, Consent to Join. Finally, Plaintiffs request that the Court authorize Plaintiffs to send a reminder notice by mail and/or email to putative class members 30 days before the 90-day deadline for opting in expires.[2] Sending reminder letters serves both to remind those persons who wish to join to do so within the notice period, and ensures that those whose notices were misplaced or not received still have a fair opportunity to join. Reminders have been regularly approved by courts. *See, e.g., Hussein v. Capital Building Servs. Group, Inc.*, 152 F. Supp. 3d 1182, 1198-99 (D. Minn. 2015) (approving reminder notices sent by mail and email); *Walkinshaw v. St. Elizabeth Regional Med. Center*, 507 F. Supp. 3d 1106, 1126 (D. Neb. 2020) (finding reminder notices "to be a reasonable and useful tool to ensure interested plaintiffs are able to timely opt-in to the litigation"); *Woods v. Caremark PHC, L.L.C.*, No. 4:14-cv-583, 2016 WL 5417445, at *4 (W.D. Mo. Aug. 2, 2016) (approving plan to email reminder notice). Furthermore, Defendant suffers no prejudice by ensuring that putative class members receive a timely reminder notice, because there is no cost to Defendant and no delay to the disposition of the matter if putative class members are reminded of the deadline to join. Reminder notices simply ensure that all affected employees have a fair opportunity to join the case before their claims expire. Given the rolling statute of limitations in FLSA cases, timely and repeated notice is necessary to protect employees' rights and prevent the loss of valid claims.

---

[2] Regarding text notice, email reminders and the possibility of electronic consent, Plaintiff notes that while "FLSA consent must generally be in writing . . . consent may be made by electronic submission and with electronic signatures, provided there are no concerns about the integrity of the consent." *Buekes v. Boehnke*, No. 24cv828, 2024 WL 4380815, at *7 (D. Minn. Oct. 3, 2024).

### E. CONCLUSION

For the reasons stated above, Plaintiff respectfully requests that this Court grant her motion and issue an Order:

1. Conditionally certifying a collective class composed of all current and former servers and bartenders of Flagship Restaurant Group, LLC, who worked for Defendants at any time from **June 14, 2021** to the present;

2. Authorizing the expedited issuance of the notice form as set forth in **Exhibit F**, and the text notice set forth in **Exhibit G,** to all class members and setting a 90-day deadline from the date of mailing of the notice for putative class members to opt into this matter;

3. Requiring Defendant to provide Plaintiffs' counsel, within 10 days of the Court's Order, a list of all individuals meeting the class definition, in an Excel spreadsheet or other machine readable format, with separate fields for each employee's name, last known address, phone number, and email;

4. Requiring Defendants to post the Court-approved notice and opt-in forms in conspicuous locations at all relevant worksites—including time clocks, employee bulletin boards or break rooms, and other locations where job notices are typically posted—for the entirety of the 90-day opt-in period; and

5. Granting any other relief this Court deems just and proper.

Plaintiffs respectfully request that the Court grant this motion in full to ensure that all potential class members receive timely and effective notice of their rights under the FLSA.

HKM EMPLOYMENT ATTORNEYS LLP

/s/ Kevin A. Todd
John J. Ziegelmeyer III*          MO No. 59042
Kevin A. Todd*                    MO No. 73048
jziegelmeyer@hkm.com
ktodd@hkm.com
1501 Westport Road
Kansas City, Missouri 64111
816.875.3332

*Admitted to Practice in D. Neb.

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF COMPLIANCE WITH WORD COUNT RULES

The undersigned hereby affirms, pursuant to NECivR 7.1(d), that this document does not exceed 13,000 words. Utilizing the word count function of Microsoft Word 2024, this document contains 4,137 words, inclusive of all text, including the caption, headings, footnotes, and quotations.

/s/ Kevin A. Todd
Attorney for Plaintiff

## CERTIFICATE OF COMPLIANCE WITH GENERATIVE AI RULES

The undersigned hereby affirms, pursuant to NECivR 7.1(d), that generative artificial intelligence was not used in the drafting of this document, or that to the extent such a program was used, the undersigned verified the accuracy of all generated text, including all citations and legal authority.

/s/ Kevin A. Todd
Attorney for Plaintiff

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 9, 2025, a copy of the foregoing was served on all counsel of record via the court's electronic filing system.

*/s/ Kevin A. Todd*
Attorney for Plaintiff
