IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| BRITTNEY HALLMAN, on behalf of herself and all other similarly situated; | 8:24CV222 |
| Plaintiff, | |
| vs. | MEMORANDUM AND ORDER |
| FLAGSHIP RESTAURANT GROUP, LLC, | |
| Defendant. | |

This matter is before the Court on the plaintiff's motion for certification of a collective action, Filing No. 82. The plaintiff asserts individual and collective claims for violations of the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. ("FLSA"). Plaintiff Brittney Hallman, on behalf of herself and other similarly situated employees, asserts defendant Flagship Restaurant Group, LLC ("Flagship"), operated unlawful tip credit practices and failed to pay lawful overtime compensation. Filing No. 83 at 5.

I.    **Background**

Flagship, a Nebraska company, owns and operates a number of restaurant brands in several states[1], including twenty locations of Blue Sushi Sake Grill ("Blue Sushi"). Filing No. 63 at 1, ¶ 2. Hallman is a former Flagship employee at the Blue Sushi in Kansas City, Missouri. *Id*., ¶ 1. During her employment, Hallman was a server and trainer. *Id*. at 9, ¶ 50. In her second amended complaint, she alleges Flagship's policies and practices regarding servers and bartenders working at its restaurant violate the FLSA. *Id*. at 2, ¶

---

[1] Flagship also owns Clio (1 location), Memoir (1 location), Pyro (1 location), Palma (1 location), Châm Pang Lanes (1 location), Ghost Donkey (2 locations), Plank Provisions (3 locations), Anthem (1 location), Blatt Beer & Table (3 locations), Flagship Commons (1 location), Revival House (1 location), and Roja Mexican Grill (1 location).

4.  Hallman asks the Court to (a) conditionally certify a class of employees and (b) approve of several notices and their dispatch, including a Notice (Filing No. 83-6), Consent to Join Form (Filing No. 83-8) and Text Message notice (Filing No. 83-7).

### (a) FLSA Conditional Class Certification

Hallman alleges she and other servers and bartenders received an hourly wage below the federal minimum wage to take a credit against tips received.  Filing No. 63 at 9, ¶ 51.  Further, she alleges Flagship required the plaintiff to engage in non-tip producing activities for more than 20 percent of her time at work.  *Id.* at 10, ¶ 52.  Hallman also alleges Flagship failed to properly pay overtime wages when tipped employees worked more than 40 hours per week.  Filing No. 83 at 2.  According to Hallman, Flagship employed other servers/bartenders with the same job duties and pay structure as the plaintiff.  Filing No. 63 at 10, ¶ 53.

Hallman alleges Flagship required its servers and bartenders to share tips with other non-tipped employees facilitated through its automated Point of Sales System ("POS").  Filing No. 63 at 2.  The POS calculated the tips received via cash or credit card transactions and divided the total tips to servers/bartenders and other non-direct service employees such as food runners, server assistants, supports staff, and sushi chefs.  *Id.* at 2–3, ¶ 9.  Thus, the plaintiff alleges servers and bartenders received "less tips than guests directly gave them as gratuities for their service."  *Id.* at 3, ¶ 13.

Further, the plaintiff states she did not request Flagship to impose the foregoing tip pool policies and practices.  Filing No. 63 at 3, ¶¶ 15–16.  The tip-sharing practices were designed, imposed, and administered by Flagship.  *Id.*  Hallman alleges Flagship only verbally told its employees about the tip-sharing requirement, but the tip policy was

neither mentioned in the employment manual nor posted in a conspicuous and accessible place at the restaurant. *Id*. at 3–4. According to the plaintiff, when other servers and bartenders complained about the tip pooling practices, Flagship's management would respond with statements such as: "It's the policy" and "This is the way we do things." *Id*. at 3, ¶ 18.

In this motion, Hallman seeks FLSA conditional collective action certification of "All people employed as servers/bartenders by Flagship Restaurant Group since June 14, 2021."[2] Filing No. 83 at 10. In support of her motion, Hallman submits her declaration along with the declarations of Cara Cumberford, Catherine Howard, Claire Hutson, and Brennen Zerbe. *Id*. at 5.

In her declaration, Hallman[3] purports she was required to tip out "4% of total sushi sales to the sushi chefs, 5% of drink sales to the bar, and 1% of total sale to support staff . . .." Filing No. 83-1 at 3 ¶ 18. Claire Hutson[4] asserts the Dallas location would also require servers and bartenders to tip out other employees. Filing No. 83-4 at 3, ¶ 17. Hutson states, "In Austin, 1.25% of total sales went to server assistants such as food runners and busboys, 4% of bar sales went to the bar, and 5% of sushi sales went to the sushi chefs." *Id*. at ¶ 18. Brennen Zerbe[5] states he would have to tip out other employees, mainly the sushi chefs, bartenders, bussers, and food runners. Filing No. 83-5 at 4, ¶ 20.

---

[2] The plaintiff filed this action on June 14, 2024.
[3] Hallman states she was employed at Blue Sushi in Kansas City, Missouri from late 2022 until June 2024. Filing No. 83-1 at 1.
[4] Hutson first worked at a Blue Sushi in Dallas, Texas from July 2019 to fall of 2021 as a server, bartender, and occasional shift lead. Filing No. 83-4. In the fall of 2021, Hutson transferred to a Blue Sushi location in Austin, Texas. *Id*. Hutson initially worked as a bartender, until she became a salaried manager in 2022. *Id*. at 1. Hutson no longer works for Flagship as of July 2024. *Id*.
[5] Zerbe worked at Blue Sushi at the Westwood, Kansas location from October 2021 to winter of 2023. Filing No. 83-5 at 1. He moved to the Blue Sushi location in Kansas City, Missouri in February 2023, and he is still currently employed there. *Id*.

Specifically, Zerbe states 4% of his tips went to the sushi chefs.  *Id.* at ¶ 21.  Cara Cumberford[6] recalls having about 10 to 15 percent of her tips taken out for the "sushi chef, host, and other non-service employees."  Filing No. 83-2 at 4, ¶¶ 24, 26.  While working at the Flagship Anthem Restaurant in Austin, Texas, Cumberford alleges she has "seen their policies regarding pay and tip payouts for servers and bartenders are very similar to the polices at Blue Sushi."  *Id.* at ¶ 29.  Catherine Howard[7] states part of her tips was distributed to other employees, mainly sushi chefs, bartenders, and hosts, but she did not specify the exact quantity.  Filing No. 83-3 at 2, ¶ 10.

In her declaration, Hallman explains that during any given shift she would work about one hour of non-tip generating side work before her shift, and during her shift, she would work about 10 to 20 percent of non-tip generating side work.[8]  Filing No. 83-1 at 2, ¶¶ 5–6.  Hutson states she worked about 20 to 30 percent of non-tip generating side work[9] as a bartender, as opposed to only one to two hours before or after her shift as a server.  Filing No. 83-4, at 2–3, ¶¶ 12, 16.  Zerbe alleges he would work about one hour of non-tip generating side work around closing time, plus 15 to 20 percent of non-tip generating side work[10] during his shift before closing time.  Filing No. 83-5 at 2, ¶¶ 6, 10. Cumberford alleges she was working about 30 to 40 percent of non-tip producing side

---

[6] Cumberford worked at Blue Sushi in Westwood, Kansas from June 2021 to June of 2024.  Filing No. 83-2.  In the summer of 2024, Cumberford began working at Flagship's Anthem Restaurant in Austin, Texas.  *Id.*  She remains employed at the Anthem restaurant.  *Id.*

[7] Howard worked at Blue Sushi in Des Moines, Iowa from June 2022 to April 11, 2024.  Filing No. 83-3.

[8] Hallman's side work consisted of "folding napkins, restocking linens, restocking soy dishes, restocking chopsticks, and refilling ice."  Filing No. 83-1 at 2, ¶ 7.

[9] In both Dallas and Austin, Hutson's side work consisted of taking down chairs, setting up tables, filling soy sauces, cutting cucumbers and lemons, wiping down table, cleaning and scrubbing floors, refilling tea, sweeping the restaurant, and preparing silverware and plates.  Filing No. 83-4 at 2, ¶ 11.

[10] Zerbe's side work consisted of restocking glasses, getting ice, filling soy sauces, wiping down surfaces, taking out trash, sweeping floors, deck brushing floors, drying floors, cleaning glasses, putting away sauces, and wrapping soy sauce.  Filing No. 83-5 at 2, ¶¶ 6, 9.

work[11] from the time the restaurant opened until the end of an opening shift.  Filing No. 83-2 at 2, ¶ 10.  Howard mentions she would work anywhere from 20 to 40 percent of non-tip generating side work[12] depending on the season and weekday.  Filing No. 83-3 at 2, ¶ 8.

With regards to the tip pooling, Hallman asked a manager about her concerns but the manager "never followed up with [Hallman] about it."  Filing No. 83-1 at 4, ¶ 21.  Hutson states she was told about the mandatory tip-out during onboarding, and she was not given an option to opt-out.  Filing No. 83-4 at 4, ¶ 20.  Zerbe states[13] he "always" questioned whether the sushi chef tip out was proper, and he wondered why he had to tip out server assistants even if they were not actually present.  Filing No. 83-5 at 4, ¶ 23.  Zerbe asserts that when he asked the general manager about the tip out, he was told he had to pay server assistant the full tip-out even if they did not work the entirety of their shift.  *Id.*, ¶ 24.  Cumberford states she expressed her concerns regarding her pay to the managers, but "nothing ever changed."  Filing No. 83-2 at 4, ¶ 28.  Howard alleges she asked the managers about the tipping policies, and they told her ". . . it's just the way it was, and no option was given to change it."  Filing No. 83-3 at 2, ¶ 10.

---

[11] Cumberford's side work consisted of "filling soy sauces, stocking tea, stocking napkins, cleaning and rolling silverware, dumping tea, cleaning drains, stocking ice, and cleaning the drink machine."  Filing No. 83-2 at 2, ¶ 11.
[12] Howard's side work consisted of cleaning, getting ice, resetting tables, taking up/down chair, sweeping the floor, assembling the soda machine, making tea/coffee, folding napkins, cleaning windows, scrubbing the floor, squeegeeing the floor, folding linen, cutting cucumbers, dumping tea, and cleaning soy.  Filing No. 83-3 at 1–2, ¶¶ 5, 6.
[13] Zerbe further states, "I had worked at other sushi establishments where the sushi chefs interacted with the guest, and had seen them earn tips there.  But at Blue sushi, the sushi chefs rarely if ever interacted with the guests.  They were more like typical back-of-house workers at other restaurants."  Filing No. 83-5 at 4, ¶ 23.

**(b) Notices**

In addition to the conditional collective class action certification, Plaintiff asks this Court to approve the plaintiff's proposed collective action Notice, Consent to Join Form, and Text Notice to all class members with a 90-day opt-in deadline from the date of mailing. Filing No. 82. The proposed text message addresses servers/bartenders at "Flagship Restaurant Group, including Blue Sushi Sake Grill, Roja Mexican Grill, Blatt Beer & Table, Plank Seafood Provision, or Anthem" with a hyperlink to the full Notice. Filing No. 83-7. Hallman also requests the Court to order the defendant to provide potential class member information[14] within 10 days of this Court's Order, including employee's full name, last known address, phone number, and email. Filing No. 83 at 13. The plaintiff asks the Court to require defendant to post the Court-approved Notice and Consent to Join Forms in conspicuous locations at all relevant worksite where job notices are typically posted. Filing No. 82, ¶ 4. Additionally, in its brief, the plaintiff asks the Court to authorize a reminder notice by mail and/or email to putative class members 30 days before the 90-day opt-in deadline. Filing No. 83 at 12.

The defendant opposes the motion asserting the plaintiff's evidence fails to establish that all servers and bartender of every Flagship restaurant are similarly situated. Filing No. 86 at 2. Defendant emphasizes that its different restaurants across several states[15] have different minimum wage, overtime requirements, and tipping arrangements. *Id.* at 3, 5. Flagship also argues its compensation, including tip pools, are different

---

[14] In its brief, Plaintiff asks "the names, last known addresses, dates of employment, job title, phone number, and email addresses of each prospective member of the class." Filing No. 83 at 11.

[15] Flagship operates numerous restaurants in several state, including restaurants locate in Nebraska, Missouri, Texas, Arizona, Illinois, Alabama, Colorado, Iowa, Indiana, Kansas, Kentucky, Ohio, and Tennessee. Filing No. 87-4 at 1, ¶ 5.

6

between restaurants depending on the type of restaurant and location. Out of the thirteen unique restaurant concepts Flagship operates, only the Blue Sushi concept employs sushi chefs. Filing No. 86 at 4. The defendant offers Mark Kantaras's[16] affidavit stating Anthem does not employ sushi chefs and it does not include them in the tip pool arrangement. Filing No. 87-4. Further, the defendant highlights how only one individual, Cumberford, alleged to have worked at a Flagship restaurant other than Blue Sushi. Filing No. 86 at 8. Kantaras asserts sushi chefs participate in certain tip pool arrangements with other employees because they prepare food in a manner that also creates a unique guest experience. Filing No. 87-4 at 2, ¶ 8.

Arguing in the alternative, the defendant urges the Court to limit the putative class to just those servers and bartenders employed by Blue Sushi Sake Grill Concept during the relevant timeframe. Filing No. 86 at 2. The defendant asks the Court to allow a 45-day opt-in deadline as opposed to the 90-day opt-in deadline proposed by the plaintiff. *Id.* at 11.

Flagship also proposes several changes to the Consent to Join Form, Text Message, and Collective Action Notice that was submitted by the plaintiff. Filing No. 87-1 – Filing No. 87-3. The defendant's suggestions mainly revolve around the limited putative class definition and 45-day opt in period. *Id.* Flagship proposes a change in the plaintiff's notice heading[17] to a different heading[18] to prevent the appearance of suit endorsement by this Court. Filing No. 87-1. Additionally, the defendant urges this Court

---

[16] Mark Kantaras is an employee of Flagship as the Director of Operations. Filing No. 87-4 at 1.
[17] The plaintiff's proposed notice has the following heading: "IN THE UNITED STATE DISTRICT COURT FOR THE DISTRICT OF NEBRASKA" (Filing No. 83-6).
[18] The defendant proposes changing the Notice's heading to: "THIS NOTICE AND ITS CONTENTS HAVE BEEN AUTHORIZED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEBRASKA, BY THE HONORABLE JOSEPH F. BATAILLON. THE COURT HAS TAKEN NO POSITION IN THE CASE REGARDING THE MERITS OF THE PARTIES' CLAIMS OR DEFENSES" (Filing No. 87-1).

7

to deny the proposed text message, and reminder requests by the plaintiff. Filing No. 86 at 10–12. With regards to the information request, Flagship suggests it should only need to provide the name and last known mailing addresses of potential members within 14–21 days of this Court's order. Id. at 12.

## II.    Law

Section 216(b) of the FLSA allows named plaintiffs to sue "for and on behalf of . . . themselves and other employees similarly situated." 29 U.S.C. § 216(b). However, "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." Id. Unlike a Rule 23 collective actions containing the "opt-out" provision, the FLSA collective action functions as an "opt-in" lawsuit, where plaintiffs must consent to join the suit. Chin v. Tile Shop, LLC, 57 F. Supp. 3d 1075, 1082 (D. Minn. 2014).

The FLSA "leaves the collective action procedures—beyond the requirement of a written opt-in—open." Campbell v. City of Los Angeles, 903 F.3d 1090, 1108 (9th Cir. 2018). Thus, many circuit courts, including the Second, Third, Ninth, Tenth, and Eleventh Circuits, have endorsed a two-step analysis.[19] See Myers v. Hertz Corp., 624 F.3d 537, 553–54 (2d Cir. 2010); Camesi v. Univ. of Pittsburgh Med. Ctr., 729 F.3d 239, 243 (3d Cir. 2013); Harrington v. Cracker Barrel Old Country Store, Inc., 142 F.4th 678, 681–83 (9th Cir. 2025); Thiessen v. Gen. Elec. Cap. Corp., 267 F.3d 1095, 1102 (10th Cir. 2001); Morgan v. Fam. Dollar Stores, Inc., 551 F.3d 1233, 1259 (11th Cir. 2008). At the first step,[20] the plaintiff moves the court to authorize notice to a proposed collective class by

---

[19] Neither the plaintiff nor the defendant have objected to the use of the two-step process.
[20] This step is often called the "preliminary certification", "provisional", or "conditional" certification of an FLSA collective action. Campbell, 903 F.3d at 1101.

8

making "a threshold showing that there is a material factual dispute as to whether the proposed collective is similarly situated." *Richards v. Eli Lilly & Co.*, 149 F.4th 901, 906,913 (7th Cir. 2025). At the second step,[21] the defendant typically moves to challenge whether the collective class is similarly situated. *Id.*

Other circuits, such as the Fifth and Sixth Circuit, conduct a one-step analysis focusing on whether other employees are sufficiently similarly situated to the plaintiff with a more stringent approach. *Newson-Pace v. United States*, 177 Fed. Cl. 262, 274 (2025); *See, e.g.*, *Swales v. KLLM Transp. Servs., L.L.C.*, 985 F.3d 430, 441–43 (5th Cir. 2021); *Clark v. A&L Homecare & Training Ctr., LLC*, 68 F.4th 1003 (6th Cir. 2023). Although the Eighth Circuit has not articulated a standard for conditionally certifying FLSA classes, the majority of the district courts in the Eighth Circuit use the two-step analysis. *See Haworth v. New Prime, Inc.*, 448 F. Supp. 3d 1060, 1066 (W.D. Mo. 2020); *Kautsch v. Premier Commc'ns*, 504 F. Supp. 2d 685, 688–89 (W.D. Mo. 2007); *Davis v. NovaStar Mortg., Inc.*, 408 F. Supp. 2d 811, 815 (W.D. Mo. 2005). As such, this court will employ the two-step analysis used within several circuit courts, including the Eight Circuit's district courts.

### (a) FLSA Conditional Class Certification

The FLSA does not define "similarly situated" nor does it provide a test to demonstrate if a prospective collective action members "similarly situated" to the plaintiff. "The plaintiff bears the burden of establishing he or she is similarly situated to other members of the proposed class." *Haworth*, 448 F. Supp. 3d at 1066 (quoting *Taylor v. Bear Commc'ns, LLC*, No. 4:12-CV-01261-BCW, 2013 WL 3270971, at *2 (W.D. Mo. June 27, 2013) (citation omitted)). "Plaintiffs may be similarly situated when 'they suffer from

---

[21] This step is often called the decertification or certification of an FLSA collective action. *Campbell*, 903 F.3d at 1101.

a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs.'" *Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 796 (8th Cir. 2014) ("Bouhaphakeo I"), aff'd, *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) (quoting *Thiessen*, 267 F.3d at 1103); *see also Campbell*, 903 F.3d at 1117 ("Party plaintiffs are similarly situated, and may proceed in a collective, to the extent they share a similar issue of law or fact material to the disposition of their FLSA claims.").

During the first stage, "the 'similarly situated' threshold requires only a 'modest factual showing.'" *Kautsch*, 504 F. Supp. 2d at 689 (quoting *Realite v. Ark Restaurants Corp.*, 7 F. Supp. 2d 303, 306 (S.D.N.Y. 1998)).  At the initial conditional-certification stage, the plaintiffs' burden is not rigorous; they must only show that there is a "colorable basis for their claim" and "that a class of similarly situated plaintiffs exists." *Smith v. Heartland Auto. Servs., Inc.*, 404 F. Supp. 2d 1144, 1149 (D. Minn. 2005).  Courts do not evaluate the merits of the plaintiff's claim at this early stage. *Haworth*, 448 F. Supp. 3d at 1066.  Instead, a plaintiff need only establish a colorable basis for a claim that the putative class members were together the victims of a single decision, policy, or plan. *Id.*  This lenient standard generally results in conditional certification of a representative class. *Id.* Any doubts in the notice stage should favor allowing conditional certification. *Id.*; *see also Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir. 1996) (noting that the "similarly situated" standard is considerably less stringent than Rule 23(b)(3) class action standards).

Courts have held that plaintiffs "need show only that their positions are similar, 'not identical to the positions held by the putative class members.'" *Smith*, 404 F. Supp. 2d at

10

1149 (quoting *Grayson*, 79 F.3d at 1096); *see also Morisky v. Pub. Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 498 (D.N.J. 2000) ("[A] collective action would only be appropriate where the plaintiffs make some showing that the nature of the work performed by other claimants is at least similar to their own." (internal quotations and alterations omitted).

At the decertification stage, however, the standard is stricter, and three factors are analyzed: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant that appear to be individual to each plaintiff, and (3) fairness and procedural considerations. *Douglas v. First Student, Inc.*, 888 F. Supp. 2d 929, 933 (E.D. Ark. 2012). Ultimately, whether "disparate factual and employment settings of the individual plaintiffs" are sufficient to bar collective treatment is a question for the second stage of the certification process. *Id.*

**(b) Notices**

"The sole consequence of conditional certification is the sending of court-approved written notice to employees, . . . who in turn become parties to a collective action only by filing written consent with the court, § 216(b)." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 75 (2013). The Supreme Court has reasoned that "[c]ourt authorization of notice serves the legitimate goal of avoiding a multiplicity of duplicative suits and setting cutoff dates to expedite disposition of the action." *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 172 (1989). Although the FLSA does not mandate any process for providing notice, courts have the discretion to facilitate the notice process. *Id*. at 165. "By monitoring preparation and distribution of the notice, a court can ensure that it is timely, accurate, and informative." *Id*. at 166.

The court overseeing the action has discretion to authorize the sending of notice to potential plaintiffs, informing them of the opportunity to opt in. *Hoffmann-La Roche Inc.*, 493 U.S. at 170–71; *see also Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1046–47 (7th Cir. 2020). In the notice, the court must respect judicial neutrality and avoid even the appearance of endorsing the action's merits. *Id*. at 174. Further, inclusion of the Court's name at the top of the Notice "is improper because it may be misconstrued as judicial support for the plaintiffs' litigation." *Martinez v. Cargill Meat Sols.*, 265 F.R.D. 490, 499 (D. Neb. 2009) (citing *Woods v. New York Life Ins. Co.*, 686 F.2d 578, 581 (7th Cir. 1982).

Under 29 U.S.C. § 256, an opt-in class member's claim for relief under FLSA does not commence until the date the opt-in member's written consent to join the representative action is filed. *Sperling v. Hoffmann-La Roche, Inc.*, 24 F.3d 463, 464 (3d Cir. 1994). The notice period under the FLSA generally should be measured from the date of the court's order granting the motion for conditional certification, not from the date that the complaint was filed. *Ritz v. Mike Rory Corp.*, No. 12 CV 367 JBW RML, 2013 WL 1799974, at *3 (E.D.N.Y. Apr. 30, 2013); *see also Doucoure v. Matlyn Food, Inc.*, 554 F. Supp. 2d 369, 373 (E.D.N.Y. 2008) (stating the end point for the lookback period for providing notice is generally the date of the notice, i.e., notice of pendency would be provided to potentially similarly-situated plaintiffs employed by defendant in three-year period preceding date of the notice).

Under the FLSA, the statute of limitations is "two years after the cause of action accrued . . . except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a). Courts have generally held that where willfulness is in dispute, a three-year statute of

limitations applies at the conditional certification stage. *Ritz*, 2013 WL 1799974, at *3. A "willful" violation of the FLSA occurs when "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988); *see also Jarrett v. ERC Props., Inc.*, 211 F.3d 1078, 1082 (8th Cir. 2000). To be considered willful, the employer's conduct must be more than negligence. *McLaughlin*, 486 U.S. at 133.

Finally, many district courts make a discretionary call to limit the opt-in periods, typically ranging from 45–90 days. *See Chin*, 57 F. Supp. 3d at 1094 (approving 90-day notice opt-in period); *Ondes v. Monsanto Co.*, No. 4:11CV197 JAR, 2012 WL 13055951, at *5 (E.D. Mo. Jan. 11, 2012) (adopting a 90-day notice period); *Martinez*, 265 F.R.D. at 501. *Sandoval v. Serco, Inc.*, No. 4:18-CV-01562 JAR, 2019 WL 13123412, at *4 (E.D. Mo. July 29, 2019) (allowing a 60-day opt-in period).

## III.  Discussion

### (a) FLSA Conditional Class Certification

The Court finds the plaintiff's motion for conditional certification should be granted. Based on the factual record, the Court finds the plaintiffs are likely similarly situated employees based on potential FLSA violations, that if proven, would give rise to class-wide liability. Hallman has met her lenient burden of establishing she and the collective class members were victims of a single decision, policy, or plan. *See Haworth*, 448 F. Supp. 3d at 1066.

Although there are some different accounts to the wage amount and required hours, many of the declarants share similar perspectives. For instance, many of the employees allegedly did not get information regarding the tip pooling, aside from verbal

13

confirmation.  Even on occasions where employees, such as Hallman and Howard, asked for clarification from managers, the employees were dismissed or given no follow up. Further, Hutson and Zerbe, allege they were explicitly told the tip pooling was mandatory, but the tip pooling policy was not listed in the employee handbooks or employment information.

The Court notes some of the tasks listed by the declarants are restaurant specific such as restocking soy dishes, restocking chopsticks, wrapping soy sauce, and cutting cucumbers.  However, many of the employees have other similar non-tip generating activities such as rolling silverware, cleaning, sweeping the floor, making tea/coffee, setting up tables, restocking linen, stocking napkins, wiping chairs, wiping tables, cleaning drains, and taking out the trash.  Even if some tasks only apply to Blue Sushi, a significant number of other tasks could apply to any, or most, restaurants across the country.

The defendant argues every restaurant varies based on location and concept. Also, Flagship asserts only the Blue Sushi concept contains the sushi chefs.  However, all the declarants mentioned tipping out to other employees aside from sushi chefs.  For instance, Hallman, Hutson, and Zerbe, mention sharing tips with support staff and/or server assistants.  Additionally, Cumberford and Howard state they shared tips with other non-service employees such as hosts.  It is likely Flagship's other restaurants have support staff, server assistants, and/or hosts at other restaurants.

Arguing in the alternative, Flagship contents the class should include only Blue Sushi employees.  This is because out of all five declarants, only one of them has worked at another restaurant.  However, the employee that worked at another restaurant, Cara Cumberford, alleges the wage and tip practices she saw at Blue Sushi were very similar

to the wage and tip practices at Anthem. Additionally, Blue Sushi is Flagship's most common concept with twenty locations as opposed to the other concepts that have at most, three locations. It is possible that the practices of its most common restaurant carry over to other restaurants.

Hallman has satisfied her burden at the first stage of the certification process. Flagship's arguments in opposition to the collective class certification are the sort of merit-based inquiries that are properly addressed at the second stage, also known as the decertification. *See Douglas*, 888 F. Supp. 2d at 929, 933. Thus, the Court finds Plaintiff's motion for conditional collective class certification should be granted. Further, the Court finds a collective class consisting of the following should be certified in this case: "All people employed as servers/bartenders by Flagship Restaurant Group since June 14, 2021."

### (b) Notices

The Court has reviewed Plaintiff's proposed Notice (Filing No. 83-6) and the defendant's proposed Notice heading (Filing No. 87-1). *See Hoffmann-La Roche Inc.*, 493 U.S. at 174. The Court will adopt the defendant's proposed Notice heading to avoid the appearance of endorsement by this Court. The other proposed changes to the Notice are minimal and lead to inconsequential disparities; thus, the rest of the Notice will remain as proposed by the plaintiff. The Court instructs the plaintiff to modify its heading to the defendant's proposed heading.[22] Further, the Court instructs the plaintiff to insert relevant

---

[22] The defendant's proposed Notice heading states: "THIS NOTICE AND ITS CONTENTS HAVE BEEN AUTHORIZED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEBRASKA, BY THE HONORABLE JOSEPH F. BATAILLON. THE COURT HAS TAKEN NO POSITION IN THE CASE REGARDING THE MERITS OF THE PARTIES' CLAIMS OR DEFENSES" (Filing No. 87-1).

information in the placeholders of the document, such as the class administrator's phone number, the date of this order, and the date of mailing, on the Notice before dispatch.

Next, the Court finds the Consent to Join Form (Filing No. 83-8) requires minor changes. The plaintiff shall amend the Form to conform to the defendant's proposed changes, except for the proposed changes in the first two lines. Aside from the first two lines of the Consent to Join Form, the plaintiff shall modify the rest of the form according to Defendant's proposed edits.

Flagship has not shown good cause to an opt-in period less than 90 days. Given Flagship operates several restaurants across multiple states, the Court finds a 90-day opt-in period is appropriate. Thus, this collective action will contain a 90-day opt-in period from the date of this Order.

The Court authorizes the plaintiff to email and mail the Notice (Filing No. 83-6) and Consent to Join Form (Filing No. 83-8) to potential class members. Also, Hallman asks the Court to require Defendant to post the Court-approved Notice and Consent to Join Forms in conspicuous locations at all relevant worksites, such as breakrooms, employee bulletin boards, or next to time clocks, the entirety of the 90-day opt-in period. The Court grants the request to post the Notice and Form in conspicuous locations at all relevant worksites during the 90-day opt-in period.

Hallman proposes sending a reminder to potential class members but does not specify if the reminder consists of the Notice, or a separate document. Further, Hallman asks the Court to authorize a text message (Filing No. 83-7) to potential class members who have not responded 30 days before the opt-in deadline. The Court finds a reminder text message potentially invasive to the recipients of the message; thus, the Court denies

Plaintiff's request to send the text message reminder.  However, the Court grants the plaintiff leave to email a reminder consisting of the Notice (Filing No. 83-6) and Consent to Join Form (Filing No. 83-8) for potential members who have not responded within 30 days before the end of the 90-day opt-in period.

Finally, Flagship shall produce to the plaintiff the first and last name, last known mailing addresses, and email address for potential opt-in plaintiffs, in an electronically manipulable format, such as a spreadsheet, within 21 days of the date of this order.

THEREFORE, IT IS SO ORDERED THAT:

1.  Plaintiff's motion for conditional certification of the FLSA collective class action (Filing No. 82) is granted.  This action is certified as an FLSA collective class action consisting of: "All people employed as servers/bartenders by Flagship Restaurant Group since June 14, 2021."

2.  The FLSA collective class action shall have an opt-in period of 90 days from the date of this order.

3.  Plaintiff's proposed Notice (Filing No. 83-6), and Consent to Join Form (Filing No. 83-8), modified as set forth in this Memorandum and Order, are approved.

4.  Plaintiff is granted leave to send the approved Notice (Filing No. 83-6) and Consent to Join Form (Filing No. 83-8) to potential opt-in plaintiffs via U.S. mail and email.

5.  Plaintiff is denied leave to follow up with a text notice to potential collective members who do not respond within 30 days before the opt-in deadline.

6.    Defendant shall post the Notice (Filing No. 83-6) and Consent to Join From (Filing No. 83-8) in relevant worksites.

7.    Defendant shall provide to the plaintiff the first and last name, last known mailing addresses, and email address, in an electronically manipulable format, such as a spreadsheet, within 21 days of the date of this order.

Dated this 7th day of November 2025.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge